James E. Miller
Laurie Rubinow
**Shepherd, Finkelman, Miller & Shah, LLP**
65 Main Street
Chester, CT 06412
Telephone: 860-526-1100
Facsimile: 866-300-7367
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

*Attorneys for Plaintiffs*

[Additional Counsel on signature page]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL CORMIER and NICHOLAS SHONER, | ) Case Number: |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **CLASS ACTION COMPLAINT** |
| vs. | ) |
| | ) |
| CARRIER CORPORATION, | ) |
| | ) |
| Defendant. | ) JURY TRIAL DEMANDED |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## CLASS ACTION COMPLAINT

Plaintiffs, Paul Cormier ("Cormier") and Nicholas Shoner ("Shoner") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, for their Class Action Complaint against Defendant, Carrier Corporation ("Defendant" or "Carrier"), allege the following based on personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, which included an analysis of Plaintiffs' documentation, industry repair bulletins, Carrier's public statements, publicly available filings in related cases, and other publicly available information.

## INTRODUCTION AND NATURE OF THE ACTION

1.     This lawsuit seeks to recover damages sustained by consumers and contractors arising from a manufacturing defect that has caused widespread failures of Thermal Expansion Valves ("TXVs") in air conditioners and heat pumps ("HVAC systems") manufactured by Carrier. Specifically, from late 2013 through at least late 2014, Carrier manufactured HVAC systems with a chemical rust inhibitor that is incompatible with the oil and/or refrigerants used in the HVAC systems and creates a sticky substance that deposits inside the system. The sticky substance is known to collect on TXVs, where it causes degraded performance and, often, acute failure of the HVAC systems.

2.     Carrier quickly discovered the defect by at least as early as the summer of 2014 (and likely much earlier due to a large number of system failures), and determined that the root cause was a rust inhibitor called Ryconox, which had been applied to the compressor motors by Carrier's supplier, Emerson Climate Technologies ("Emerson"). Despite knowing about this defect, however, Carrier continued to sell these defective HVAC systems containing the rust inhibitor to unsuspecting consumers without disclosing the defect so that Carrier could offload its

inventory of thousands of affected HVAC systems. Even after Carrier eventually admitted the existence of the manufacturing defect in dealer service bulletins in 2014, Carrier never pulled the affected systems from the shelves of distributors and never disclosed the defect to consumers. The dealer service bulletins were not distributed publicly, and consumers were never informed of this known defect.

3.      Upon information and belief, thousands of Carrier systems failed within just months of purchase due to this undisclosed defect, and tens (or hundreds) of thousands contain the defect that has and will impact their performance and value for years to come. Moreover, despite the fact that Carrier knowingly sold these defective systems, Carrier's limited warranty does not cover labor or other incidental costs associated with necessary repairs; Carrier's warranty covers parts only. By failing to disclose the existence of this known defect, and refusing to cover the full costs of labor, Carrier has unfairly foisted significant repair costs onto consumers.

4.      Moreover, Carrier has even refused to provide adequate component replacements to fix the systems, as required by its own warranty. Rather than replace the contaminated oil, clogged TXVs, and other parts necessary to remove the defective contamination as required by the terms of its warranty, Carrier instructed service personnel to inject the failed systems with yet another chemical, called A/C Re-New (also known as Zerol Ice), which dissolves Ryconox clogs. As discussed herein, however, A/C Re-New is highly acidic, and causes damage to the systems in which it is injected. It dissolves metal components, it causes premature wear, and it damages and devalues the HVAC systems.

5.      Even where Ryconox contamination has not yet resulted in a complete TXV clog or system failure, this known defect impacts performance, even though many consumers are not aware that performance has degraded. Even a partial TXV clog can significantly impair the

performance and efficiency of an HVAC system. Thus, many owners of the defective units are likely experiencing degraded performance even if they have not yet experienced an acute failure, and, as Ryconox continues to deposit, there is a high likelihood of future failure. This contamination should never have been present or, at minimum, should have been disclosed to consumers.

6.      Plaintiffs seek relief on behalf of themselves and a class of similarly situated persons to remedy Carrier's violations of state consumer protection laws, common law, the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. ("MMWA"), and for breach of contract for failure to provide adequate repairs as required by warranty. Plaintiffs seek to require Carrier to, *inter alia*, fully compensate consumers for their out-of-pocket costs resulting from the defective contamination, as well as all other costs necessary to remedy the defect including, but not limited to, removing the chemical contaminants (including A/C Re-New) from the affected systems.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, and pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Carrier maintains its world headquarters within this district.

## ADDITIONAL FACTS

9.     An HVAC system utilizes three primary components: a **compressor** that is driven by an electric motor, which compresses the refrigerant causing it to undergo a phase change from gas to liquid and causing its temperature to increase; a **condenser coil** typically located outside the building, where a fan blows air over the condensed refrigerant to reduce its temperature; and an **evaporator coil** typically located inside the building, where the pressure on the refrigerant is released, causing it to cool significantly, and over which another fan blows indoor air.



**Central Air-Conditioning & Heating System**
Graphic courtesy: Air-Conditioning & Refrigeration Institute

10.     The refrigerant arrives at the compressor as a cool, low-pressure gas. The compressor squeezes the refrigerant causing its molecules to be closer together, and the temperature to rise. The compressed, hot refrigerant is then circulated through the outdoor condenser coil, where a fan blows air over the condenser coil. Even though the outdoor temperature may be high, the temperature of the refrigerant is higher, so blowing air over it removes heat from the refrigerant in the outdoor unit. The condensers' fins act like a radiator to

quickly dissipate the heat. As the refrigerant leaves the condenser, its temperature is much cooler and it has changed from a gas to a liquid under pressure.

11.     When it arrives at the evaporator coil inside the building, the pressure of the refrigerant is released, and as the liquid changes to gas and evaporates, its temperature drops significantly. This cold refrigerant is circulated through the evaporator, which also has metal fins to facilitate the exchange of thermal energy with the surrounding air. A large fan circulates air over these fins to be cooled and then throughout the interior of the building. When the refrigerant leaves the evaporator, it is returned to a cool, low pressure gas to cycle back through the compressor to repeat the process. This process continues until the building reaches the desired temperature.

12.     In addition to refrigerant, an HVAC system requires oil to maintain lubrication of the compressor. During operation, oil is circulated through the compressor and over the compressor motor, and a portion of this oil mixes with the refrigerant and circulates throughout the entire HVAC system, eventually returning to the compressor. Due to the careful balancing of chemical and physical properties of the refrigerant and oil, which mix together, nothing other than oil and refrigerant should typically be circulating through an HVAC system. The addition of any additives will usually void a manufacturer's warranty.

13.     A heat pump is an air conditioner that can also run in reverse, heating the interior of a building in winter and cooling it in summer. A heat pump contains a reversing valve that lets it switch between "air conditioner" and "heater." The valve allows the condenser (hot coil) and evaporator (cold coil) to reverse places in the winter. In the cooling mode, the valve slides to a position that permits the hot refrigerant gas from the compressor to flow through the top port to the bottom port to the water coil. Thus, the heat pump functions like an air-conditioner. This

diagram illustrates the process:



## Refrigerant and Oil

14.    For more than four decades, R-22 was the refrigerant of choice for HVAC systems. Unfortunately, R-22 is a greenhouse gas and depletes ozone, and the manufacture of R-22 results in a by-product that contributes significantly to global climate change. As a result of efficiency and environmental regulations, in recent years a new refrigerant, R-410A, supplanted R-22, which is no longer permitted in HVAC systems manufactured after January 1, 2010.

15.    The transition to 410A refrigerant had a number of effects on HVAC design. Just as an example, 410A is more efficient and operates under higher pressure, which means that compressors and certain other components were re-designed to accommodate these higher pressures.

16.    Of particular relevance here, the adoption of 410A refrigerant required the use of synthetic oil to lubricate the compressor. HVAC equipment that utilized R-22 typically relied on mineral oil to lubricate compressors. 410A refrigerant is incompatible with mineral oil, so

beginning in 2010 when 410A refrigerant supplanted R-22, most manufacturers, including Carrier, began using synthetic oil, called Polyolester ("POE") oil.

17.    POE oil has several benefits over mineral oil. For example, it allows the oil and refrigerant to mix well (called "miscibility"), so the compressor is well-lubricated.

18.    Critically, however, POE oil requires significant additional care in manufacturing to ensure that no physical or chemical contaminants remain as a result of manufacturing processes. For example, POE oil is more hygroscopic than mineral oil, meaning it absorbs moisture. When POE oils are exposed to moisture and heat, they may react, forming acid that is harmful to the system.

19.    POE oils are also solvents. This means that extra care must be taken in the manufacturing processes of HVAC equipment to ensure that the system is free of impurities or contaminants, which can include chemical, as well as physical contaminants that might react with the POE oil.

20.    Manufacturers have also known for many years that manufacturing process chemicals, such as rust inhibitors, can react with POE oil leading to TXV clogs, among other problems.

21.    The qualities of POE oil have been well-known to HVAC manufacturers since they began using POE oil, and manufacturers also knew that extra care was required during manufacturing to ensure that no contaminants remain in the equipment that could react with POE oil or 410A refrigerant.

**TXV Valves**

22.    The need to ensure that HVAC manufacturing processes do not leave incompatible contaminants is further amplified by another recent development in HVAC equipment

manufacturing, namely the use of TXVs.

23.     As explained above, the process by which air conditioners work involves releasing the pressure on the refrigerant, which causes the temperature of the refrigerant to drop dramatically. The valve that accomplishes this pressure change is therefore critical to the functioning of the HVAC system.

24.     Prior to 2006, many manufacturers used fixed-orifice valves, which are either fully open or fully closed. In 2006, new regulations took effect that required HVAC equipment to meet certain minimum efficiency standards. As a result of those standards, beginning in 2006, most HVAC manufacturers began using TXVs. TXVs are precision valves designed to regulate the rate of refrigerant-liquid flow. Unlike fixed orifice valves, a TXV meters the refrigerant's flow rate in proportion to the rate of evaporation of the refrigerant in the evaporator. This means TXVs are much more efficient. It also means that TXVs are more sensitive and can fail if there is contamination in the system.

25.     The TXV is by nature a bottleneck. It typically operates by using a movable valve pin to precisely control the flow of liquid refrigerant through an opening. If contaminants collect on the TXV it may operate inefficiently, or the system may cease to function altogether. With the use of R-410A and POE oils, in conjunction with TXVs, it is imperative to ensure no physical or chemical contaminants are circulated within the system that could clog the TXV or cause the pin to stick. Manufactures, including Carrier, have known for many years that manufacturing process chemicals, such as rust inhibitors, can react with POE oil and clog TXVs.

**Carrier Equipment is Plagued by Sticking TXVs Due to the Defect**

26.     Carrier, like many other manufacturers, purchases HVAC system components from sub-tier suppliers and used these components to build its HVAC systems. Relevant here, for

many of its HVAC systems Carrier purchased compressors from Emerson, called Copeland Scroll Compressors.

27.    In late-2013, Emerson began applying a new rust inhibitor, called Ryconox, to the motors used in its Copeland Scroll Compressors. The rust inhibitor serves no purpose in a finished HVAC system. Rather, its purpose is solely to ensure that rust does not develop during shipping and storage of component parts. Carrier and Emerson both knew that it was of paramount importance to ensure that manufacturing process chemicals, like the rust inhibitor, are compatible and do not cause reactions with the oil used in the systems, particularly since the oil washes over the compressor motor and then circulates through the system.

28.    Soon after Emerson and Carrier started using Ryconox, complaints began flooding in that new HVAC systems containing Copeland Scroll compressors were failing within just weeks of installation due to stuck TXVs. By June 2014, the problem had reached a crescendo and industry participants went into high gear to try to identify the precise nature of the defect. Early testing pointed to a chemical reaction (hydrolysis or polymerization) causing organic compounds to form a dark and sticky substance that adheres to the orifice cone of the TXV.

29.    The picture below at left shows a clean pin, spring and cap and the picture at right shows a TXV pin, spring and cap covered in debris due to Ryconox:




Source: Virginia Air Distributors, Inc., VAST-14-006 Service Tip, 9/9/2014.

30.     Industry participants, including Carrier, soon confirmed that the problem was the presence of Ryconox in the compressors, which was reacting with the refrigerant and/or oil and sticking to the TXV. By no later than August 2014, Carrier had submitted a "white paper" to Emerson that demonstrated "conclusively that the root cause of the TXV contamination [was the] rust inhibitor called Ryconox . . . ."

31.     Nevertheless, even after the precise cause of the defect was discovered, Carrier continued to sell defective units without warning consumers in order to use up existing inventory in its pipeline. Had Carrier disclosed this known contaminant, consumers would not have purchased the defective HVAC systems, or would have paid substantially less for them given the expectation that they would require costly repairs to remove the contamination.

**Carrier's A/C Re-New Additive "Fix"**

32.     Carrier's warranty states that it "warrants this product against failure due to defect in materials or workmanship . . . . If a part fails due to defect during the applicable warranty period [Carrier] will provide a new or remanufactured part . . . to replace the failed defective part at no

charge for the part." The warranty excludes labor costs, but it covers all parts. Of particular relevance, it has no exclusion for oil. In order to remove the contamination, Carrier at minimum should have replaced the compressors that contain the rust inhibitor, flushed the systems, and replaced the oil, refrigerant, and TXVs. That is an expensive process, however.

33.    Rather than replace the defective equipment—or replace the contaminated oil, TXVs, and filters as required by its warranty—in or around October 2014 Carrier decided to instruct contractors to use a "quick fix." Carrier began advising service personnel to inject the systems with a chemical additive, A/C Re-New, to dissolve the sticky substance that was clogging TXVs. Like most quick fixes, however, these additives are not an adequate repair and, in fact, create entirely new problems.

34.    A/C Re-New is an after-market chemical additive that was originally marketed as a way to squeeze some extra life out of HVAC equipment that is on its last legs, "particularly older systems where performance may have diminished over the years." Indeed, ordinarily, injecting A/C Re-New into an HVAC system would void the manufacturer's warranty.

35.    Injecting A/C Re-New does not remove the rust inhibitor contamination. To the contrary, adding A/C Re-New merely adds more contamination, none of which should be in a brand-new air conditioning system. The chemical contamination continues to circulate through the HVAC system, posing a likelihood of future re-occurrence, while injecting acidic additives creates a host of new problems.

36.    In connection with investigating the use of this chemical additive to dissolve TXV clogs in affected systems, Emerson performed tests of the additive. The results of these tests showed that: (1) injecting A/C Re-New causes acidity far above generally acceptable levels; (2) A/C Re-New and the resulting acidity cause the copper used in pipes and coils to dissolve and

deposit inside the compressor (called "copper plating"); (3) A/C Re-New dissolves lead used in the compressor bearings; (4) A/C Re-New causes a significant increase in "hydrolysis," or chemical breakdown, of the oil in the systems; and (5) A/C Re-New causes swelling of certain non-metallic materials, such as neoprene, that are commonly used for gaskets, such as in the TXV. Emerson's testing also showed abnormal compressor wear on all tested systems that were run with A/C Re-New, as set forth below.

37.    A/C Re-New is highly acidic, and it causes acidity to spike well above generally accepted levels.

38.    Acidity is measured by the Total Acid Number ("TAN") and is typically stated in terms of "mg KOH/gram," which means the number of milligrams of potassium hydroxide needed to neutralize one gram of the substance being measured. The baseline acidity for POE oil is about .05 mg KOH/g. Internally, Emerson has stated that any lubricant additives should be "non-acidic and not increase the TAN significantly" because such additives can be "overly reactive and form unwanted byproducts," and because "high TAN compressor oil is typically discouraged by OEMs." Nucalgon, the manufacturer of A/C Re-New, states that for air conditioning systems the "generally accepted maximum [TAN] is .16 mg, although some industry experts consider numbers as high as .21 marginally safe."

39.    A/C Re-New, however, causes acidity to spike far above the .16 mg generally accepted maximum. In fact, in one Emerson test, A/C Re-New caused the TAN to spike from .05 to 1.8 mg KOH/g, a 3600% increase over the baseline, which is more than ten times higher than the generally accepted maximum and eight times higher than the level considered "marginally safe." After Emerson performed reactivity testing, the TAN spiked even higher, to 3.55 kg KOH/g. (This was 328% higher than normal POE oil after reactivity testing.)

40.    Other testing showed acidity levels in systems after injection of A/C Re-New of around 1.6 mg KOH/g, which gradually declined to around .5 mg KOH/g due to reactions with metal surfaces. Even after reacting with the metal in the system, the acidity was still more than double the generally accepted maximum.

41.    In addition to (and likely because of) its high acidity, A-C Re-New has significant negative effects on the air conditioning systems into which it is injected.

42.    For example, it dissolves lead used in the compressor bearings. In fact, Emerson's testing showed that A/C Re-New resulted in 540% increase in dissolved lead (60ppm vs 325 ppm). The compressors utilize leaded bronze bearings, and these are attacked by the A/C Re-New.

43.    A/C Re-New also dissolves copper. Copper tubing is used in much of the affected air conditioning system, including the coils and linesets (i.e., the pipes connecting indoor and outdoor units). Dissolving of the copper weakens these components and can lead to refrigerant leakage.

44.    When copper is dissolved from these components, it can become redeposited on non-copper surfaces, which is called "copper plating," particularly in the compressor. Emerson's testing showed that A/C Re-New caused significant dissolved copper and also copper plating of the compressors.

45.    Emerson also found that A/C Re-New resulted in an 8% increase in hydrolysis of the oil. Hydrolysis is a breakdown of the POE oil. Hydrolysis increases acidity of the oil, and degrades the performance of the oil, leading to compressor wear.

46.    Emerson further determined that A/C Re-New causes swelling of certain nonmetallic materials, such as neoprene, that are commonly used for gaskets, such as in the TXV.

47.     Emerson conducted "tear down" testing on eight systems injected with A/C Re-New, and every single one of them reflected damage.

48.     As summarized by Emerson's engineer, the tested compressors showed: (a) abnormal drive bearing wear; (b) abnormal bronze exposure from wear; (c) abnormal scroll tip wear (the scroll is the portion of the compressor that actually compresses the refrigerant); (d) "heavy wear" on several lower bearings; and (e) "badly" discolored oil.

49.     Moreover, all of the units showed copper plating—sometimes "heavy copper plating"—from dissolved copper.

50.     In short, Emerson's testing confirmed that the acidity from this additive causes degradation of the oil and dissolution of metal, which leads to abnormal wear of compressor components.

51.     Notwithstanding all of these known, negative effects, Carrier instructed service personnel to inject this additive because it was cheaper than performing a real fix as required by the warranty. At the same time, Defendant never disclosed the negative effects the additive would have to either service personnel or consumers.

**Compressors Treated With A/C Re-New Do Not Pass Without Objection in the Trade**

52.     Not surprisingly, given the damage caused by this additive, HVAC systems containing Ryconox and subsequently injected with the additive do not pass without objection in the trade.

53.     As noted above, despite discovering the defect by no later than mid-summer 2014, Carrier continued to sell affected HVAC systems to consumers without disclosing the presence of the defective contaminant. Yet, at the same time, Carrier, and many other manufacturers, returned unused compressors containing Ryconox back to Emerson.

54.     By 2015, Emerson had millions of dollars of inventory of these unused compressors containing Ryconox. Emerson began injecting these compressors with A/C Re-New at its factory and attempted to re-sell them back to HVAC manufacturers. According to Emerson documents, all but one of the seven largest manufacturers refused to accept these "remediated" compressors containing A/C Re-New.

55.     Thus, Carrier cannot claim that HVAC systems containing Ryconox and/or injected with A/C Re-New pass without objection in the trade given that the vast majority of major manufacturers refuse to accept them.

## PARTIES

**Plaintiffs**

56.     Cormier is a resident of Plymouth, Massachusetts, and, thus, a citizen of Massachusetts.

57.     In October 2014, Cormier purchased a new Bryant-branded HVAC system with a new-construction home. Prior to completing his purchase, Cormier conducted a detailed inspection of both the indoor and outdoor units of his HVAC system along with a representative of the builder, who instructed him concerning, among other things, winterization of the outdoor unit. Carrier never disclosed the defect, however, either on the product itself or anywhere else. So, during this detailed inspection of the product prior to purchase, Cormier saw no disclosure on the product (or anywhere else) that the HVAC system contained a contaminant that rendered it defective, as no such disclosure was made. Moreover, Cormier was provided with a user manual and warranty for the system, neither of which disclosed the defect. If the defect had been disclosed, Cormier would not have purchased the Carrier system.

58.    Within two years, Cormier's HVAC system failed, and he contacted Beantown AC, Inc. ("Beantown") to diagnose his system. A Beantown technician diagnosed Cormier's system as having high superheat, low subcooling, and a restricted TXV. The Beantown technician also noted that there was a Carrier bulletin instructing service personnel to inject A/C Re-New and that if the A/C Re-New failed to resolve the problem, the TXV would have to be replaced. On August 4, 2016, the technician injected Cormier's system with A/C Re-New. Cormier paid $314.00 out of pocket for the injection of A/C Re-New. Cormier's system still contains the defective contaminant and has suffered further damage caused by the injection of A/C Re-New.

59.    Shoner is a resident of Saline, Michigan, and, thus, a citizen of Michigan.

60.    On June 30, 2014, Shoner purchased a 3.5-ton Payne-branded HVAC system for $1,226.44 from Behler-Young Company in Ann Arbor, Michigan. Prior to the purchase, Shoner, at a minimum, reviewed Carrier brochures from the distributor, which provided information regarding system capacity and specifications, and a display at the distributor. Carrier did not disclose on its brochures or display, or anywhere else for that matter that its HVAC systems contained a chemical contaminant that would cause them to cease functioning soon after installation. If Carrier had disclosed the defect, Shoner would not have purchased the Carrier system.

61.    On July 15, 2014, a local dealer, Les Pullins Mechanical ("Les Pullins"), installed his HVAC system.

62.    In the late summer of 2015, Shoner's HVAC system failed. Shoner called Les Pullins so that his HVAC system could be diagnosed. The technician determined that the system's evaporator coil was freezing, and advised that the TXV needed to be replaced.

63.    On August 17, 2015, Shoner purchased a new TXV for $84.82 from Behler-Young Company. On March 26, 2016, Shoner paid a contractor from Precision Climate Services approximately $300 to replace the TXV.

64.    Within a short time, however, the evaporator coil began to freeze again. On July, 16, 2016, Precision Climate Services injected Shoner's HVAC system with A/C Re-New, at a cost to Shoner of between $200 and $300. Shoner's system still contains the defective contaminant and has suffered further damage caused by the injection of A/C Re-New.

**Defendant**

65.    Carrier maintains its world headquarters at One Carrier Place, Farmington, Connecticut 06034. Carrier is, thus, a citizen of Connecticut. Carrier manufactures HVAC systems and represents itself as the "world's leader in high-technology heating, air-conditioning and refrigeration solutions" because its "experts provide sustainable solutions, integrating energy-efficient products, building controls, and energy services for residential, commercial, retail, transport and food service customers."

<u>**NOTICE TO CARRIER**</u>

66.    Plaintiffs, through their counsel, sent a demand letter to Carrier via certified mail on April 25, 2018, notifying Carrier of its breaches of warranty and violations of consumer protection and other laws. The letter asserted that, by virtue of Carrier's conduct in selling defective HVAC systems and by failing to adequately repair them under warranty, Carrier is in breach of its implied and express warranties and violated the MMWA, as well as the common law and consumer protection laws of Plaintiffs' respective states. Plaintiffs demanded that Carrier, *inter alia*, replace all affected HVAC Systems, or all such parts (including refrigerant, oil, filters, and TXVs) as are necessary to fully remove the rust inhibitor associated with clogged

TXVs and also any A/C Re-New that was injected; and reimburse Plaintiffs and all purchasers and owners who incurred out-of-pocket costs to diagnose and repair the defective systems. Plaintiffs requested a response within thirty days. A copy of Plaintiffs' demand letter is attached hereto as Exhibit A.

## CLASS ACTION ALLEGATIONS

67.    Plaintiffs bring this lawsuit, both individually and as a class action, on behalf of similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

68.    For Plaintiffs' claims under the MMWA (Count I), Plaintiffs seek to certify the following nationwide class (the "Nationwide Class"):

> **Nationwide Class**
> All persons and entities that purchased an HVAC system manufactured by Carrier that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities that have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

69.    In addition to Plaintiffs' request for a nationwide class under federal law, Plaintiffs seek to certify subclasses for their common law and state statutory claims under Massachusetts law (the "Massachusetts Sub-Class") and Michigan law (the "Michigan Sub-Class") as follows:

> **Massachusetts Sub-Class (represented by Cormier)**
> All persons and entities in Massachusetts that purchased an HVAC system manufactured by Carrier that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical contaminants remaining from the manufacturing process.

> **Michigan Sub-Class (represented by Shoner)**
> All persons and entities in Michigan that purchased an HVAC system manufactured by Carrier that includes a Copeland Scroll Compressor manufactured with Ryconox rust inhibitor, and all persons and entities who have not been fully reimbursed for parts, materials, or labor expended in diagnosing and/or servicing such HVAC systems for performance issues caused by chemical

contaminants remaining from the manufacturing process.

70.     The Nationwide Class, Massachusetts Sub-Class and Michigan Sub-Class are collectively referred to hereafter as the "Class."

71.     Plaintiffs may seek to certify additional sub-classes as the Court may deem appropriate.

72.     Excluded from the proposed Class are the following individuals and/or entities: the Court, all Court personnel involved in the handling of this case, as well as their immediate family members; Carrier and its subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Carrier has a controlling interest; all individuals who timely elect to be excluded from this proceeding using the correct protocol for opting out; and any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, councils and/or subdivisions.

73.     **Numerosity:** Upon information and belief, the Class is comprised of hundreds, if not thousands, of persons throughout the United States and is so numerous that the joinder of all members of the Class is impracticable. While the exact number of individuals who purchased Carrier HVAC systems can only be ascertained through discovery, the identity of Class members is readily determinable from Carrier's records.

74.     **Common Questions of Law and Fact Predominate:** There are questions of law and fact common to the Class, which predominate over any individual issues, including:

(a) Whether and when Carrier knew or should have known that its manufacturing processes were not adequate in light of the known properties of POE oil and consistent with its use of TXVs;

(b) Whether Carrier knowingly sold HVAC systems that had a high propensity to clog the TXV due to defects in manufacturing;

(c) Whether the addition of A/C Re-New, which Carrier has been prescribing, will have negative long-term effects or shorten the life of the HVAC systems;

(d) Whether Carrier's HVAC systems were sold with a manufacturing defect;

(e) Whether a reasonable consumer would consider the defect or its consequences to be material;

(f) Whether Carrier concealed and/or failed to disclose the defective condition of the HVAC systems to consumers;

(g) Whether Carrier breached express and implied warranties;

(h) Whether Carrier was unjustly enriched;

(i) Whether Carrier breached consumer protection laws of the States of Massachusetts and Michigan; and

(j) Whether Plaintiffs and the Class have sustained monetary losses and, if so, the proper measure of those losses.

75.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by Carrier's common course of conduct.

76.    **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interest of the Class and have retained counsel with substantial experience in handling complex class action litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class.

77.    **Superiority of Class Action:** A class is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class is likely in the millions of dollars, the individual damages incurred by each Class member resulting from Carrier's wrongful conduct are not substantial enough to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Carrier has acted on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

78.    Given that Carrier engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved and common questions far outweigh any potential individual questions.

79.    Plaintiffs reserve the right to revise the above Class definitions based on facts adduced in discovery.

## TOLLING OF THE STATUTES OF LIMITATION

80.    Discovery Rule: Plaintiffs' and Class members' claims accrued upon discovery that Carrier's HVAC systems contained an unapproved chemical contaminant that causes acute,

and partial, TXV failures, which Carrier attempted to repair with inadequate parts and injections of A/C Re-New—none of which remedy the presence of the chemical contaminant. While Carrier knew and concealed these facts, Plaintiffs and Class members could not and did not discover these facts through reasonable, diligent investigation until after they experienced acute TXV failure due to the presence of Ryconox and learned that the issue was not isolated to their HVAC systems.

81.    Fraudulent Concealment Tolling: Any statutes of limitation were and are tolled by Carrier's knowing and active concealment of the facts set forth herein. Carrier had a duty to disclose the material defect to Plaintiffs and the Class. Yet, Carrier intentionally kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claims without any fault or lack of diligence on the part of Plaintiffs. The details of Carrier's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control to the exclusion of Plaintiffs and Class members and await discovery. Plaintiffs could neither have reasonably discovered these facts nor reasonably discovered that Carrier failed to disclose material facts concerning the chemical contaminant in its HVAC systems.

82.    Equitable Tolling: Defendant took active steps to conceal and misrepresent material facts relating to the material defect and the HVAC systems' quality. Carrier's misrepresentations and omissions misled Plaintiffs and the Class concerning their claims. The details of Carrier's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable

tolling.

83.    <u>Estoppel</u>: Carrier was and is under a continuous duty to disclose to Plaintiffs and all Class members the material defect and the true character, quality, and nature of its HVAC systems. At all relevant times, and continuing to this day, Carrier knowingly, affirmatively, and actively concealed the defect and the true character, quality, and nature of its HVAC systems. The details of Carrier's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Carrier, for example, intentionally misled Plaintiffs and the Class by informing them that TXV replacements or injections of A/C Re-New would repair their HVAC systems, but Carrier knew that such "repairs" were not adequate to remedy the defect (i.e., chemical contamination). Plaintiffs reasonably relied on Carrier's misrepresentations and active concealment. Based on the foregoing, Defendant is estopped from relying on any statutes of limitation in defense of this action.

## CAUSES OF ACTION

### COUNT I
**Violation of the MMWA**
**15 U.S.C. §§ 2301-2312**
**(On behalf of the Nationwide Class)**

84.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

85.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, in the alternative, the State Sub-Classes.

86.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

87.    Carrier HVAC systems are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

88.     Carrier is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

89.     Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligation of its express and implied warranties.

90.     The MMWA, 15 U.S.C. §2301(d)(1), provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

91.     Carrier provided Plaintiffs and Nationwide Class members with a written warranty within the meaning of the MMWA, 15 U.S.C. § 2301(6).

92.     Carrier breached the warranty, as described in more detail herein, by manufacturing Carrier HVAC systems that are defective in design, materials and workmanship and are likely to fail prematurely, and further by failing to adequately repair them by removing the contamination and, instead, injecting yet another contaminant that damages and devalues the HVAC systems and creates a likelihood of premature failure.

93.     As a result of Carrier's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and Class members have suffered damages.

94.     Plaintiffs and Class members are entitled to recover damages as a result of Carrier's breach of warranties.

95.     Plaintiffs and Class members are also entitled to seek costs and expenses, including attorneys' fees under the MMWA, 15 U.S.C. §2301(d)(2).

### COUNT II
**Massachusetts Unjust Enrichment**
**(Cormier, Individually and On Behalf of the Massachusetts Sub-Class)**

96.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth

herein.

97.     Cormier brings this claim in the alternative and on behalf of himself and the Massachusetts Sub-Class.

98.     Cormier and Massachusetts Sub-Class members conferred a tangible economic benefit upon Carrier. Massachusetts Sub-Class members who are contractors promote, purchase, and re-sell installed Carrier HVAC systems and thereby confer a direct benefit on Carrier. Likewise, Massachusetts Sub-Class members who are end-users purchase Carrier HVAC systems and confer a direct benefit in the form of profits on Carrier. Carrier has knowingly retained the benefits of these purchases under circumstances that make it inequitable for Carrier to retain those benefits without paying the value thereof. Specifically, Carrier retained these benefits despite knowing the HVAC systems purchased by Plaintiffs and Massachusetts Sub-Class members contained a material defect that would require costly repairs that would not be fully covered by Carrier's limited warranty. If Defendant had disclosed this material defect, Plaintiffs and Massachusetts Sub-Class members would not have purchased the defective systems, or would not have agreed to pay premium prices for the Carrier HVAC systems.

99.     Cormier purchased the Carrier HVAC system from Carrier's agents, in part, because of Carrier's advertisements, marketing, and product claims, and as a result, a relationship between the parties has been created even though Cormier did not purchase a Carrier HVAC system directly from Carrier.

100.    Failing to require Carrier to provide remuneration under these circumstances would result in it being unjustly enriched, at the expense of contractors. Carrier's retention of the benefit conferred upon it by members of the Massachusetts Sub-Class would be unjust and inequitable, and Carrier should be required to pay restitution to Cormier and Massachusetts Sub-Class members

for its unjust enrichment.

## COUNT III
### Michigan Unjust Enrichment
### (Shoner, Individually and On Behalf of the Michigan Sub-Class)

101.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

102.    Shoner brings this claim in the alternative and on behalf of himself and the Michigan Sub-Class.

103.    Shoner and Michigan Sub-Class members conferred a tangible economic benefit upon Carrier. Michigan Sub-Class members who are contractors promote, purchase, and re-sell installed Carrier HVAC systems and thereby confer a direct benefit on Carrier. Likewise, Michigan Sub-Class members who are end-users purchase Carrier HVAC systems and confer a direct benefit in the form of profits on Carrier. Carrier has knowingly retained the benefits of these purchases under circumstances that make it inequitable for it to retain those benefits without paying the value thereof. Specifically, Defendant retained these benefits despite knowing the HVAC system purchased by Shoner and Michigan Sub-Class members contained a material defect that would require costly repairs that would not be fully covered by Carrier's limited warranty. If Carrier had disclosed this material defect, Shoner and Michigan Sub-Class members would not have purchased the defective systems, or would not have agreed to pay premium prices for the Carrier HVAC systems.

104.    Shoner purchased a Carrier HVAC system from Carrier's agents, in part, because of Carrier's advertisements, marketing, and product claims, and as a result, a relationship between the parties has been created even though Shoner did not purchase the Carrier HVAC system directly from Carrier.

105.    Failing to require Carrier to provide remuneration under these circumstances would result in Carrier being unjustly enriched at the expense of Contractors. Carrier's retention of the benefit conferred upon them by members of the Class would be unjust and inequitable, and Carrier should be required to pay restitution to Plaintiffs and Class members for its unjust enrichment.

## COUNT IV
### Violations of the Massachusetts Consumer Protection Act
### MASS. GEN. LAWS ch. 93A, §§ 1-11
### (Cormier, Individually and On Behalf of the Massachusetts Sub-Class)

106.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

107.    Cormier brings this claim on behalf of himself and the Massachusetts Sub-Class.

108.    Cormier, members of the Massachusetts Sub-Class, and Carrier are "persons" under the MASS. GEN. LAWS ch. 93A, § 1.

109.    In accordance with MASS. GEN. LAWS ch. 93A, § 9(3), on April 25, 2018, a written demand for relief was made on Carrier on behalf of Cormier and the Massachusetts Sub-Class.

110.    Carrier did not make a reasonable offer of relief to the Massachusetts Sub-Class.

111.    MASS. GEN. LAWS ch. 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." MASS. GEN. LAWS ch. 93A, § 9 permits any person injured by a violation of MASS. GEN. LAWS ch. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

112.    Carrier engaged in unfair and deceptive acts and/or practices in the conduct of trade or commerce in violation of MASS. GEN. LAWS ch. 93A, § 2.

113.     Carrier's unfair and deceptive scheme to mislead consumers was comprised of countless unfair and deceptive acts or practices, including, but not limited to, manufacture and sale of HVAC systems with a manufacturing defect and uniformly representing to Cormier and the Massachusetts Sub-Class, by means of its advertising and marketing, false information, and product packaging (including federally required EnergyGuide labels) regarding the efficiency, performance, reliability, and warranty terms of its HVAC Systems. These unfair and deceptive acts and practices have a capacity, tendency, and/or likelihood to deceive or mislead reasonable consumers.

114.     Carrier's conduct, as alleged herein, violates various regulations promulgated by the Massachusetts Attorney General pursuant to MASS. GEN. LAWS ch. 93A, § 2(c), including the following:

- 940 MASS. CODE REGS. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

- 940 MASS. CODE REGS. § 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

- 940 MASS. CODE REGS. §3.05(2) (prohibiting the use of any advertisement "which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale");

- 940 MASS. CODE REGS. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty");

- 940 MASS. CODE REGS. § 3.16(2) (providing that it is a violation of ch. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction"); and

- 940 MASS. CODE REGS. § 3.16(3) (providing that an act or practice violates ch. 93A, § 2 if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection").

115.    Carrier's violations of MASS. GEN. LAWS ch. 93A were willful and knowing.

116.    As a direct and proximate result of Carrier's unfair and deceptive acts, Cormier and the Massachusetts Sub-Class were injured and suffered damages and are entitled to actual or statutory damages, treble damages, attorneys' fees and costs. The injuries suffered by Cormier and the Massachusetts Sub-Class include, but are not limited to, purchasing an HVAC system they otherwise would not have, or, alternatively, paying a premium price for Carrier's falsely advertised HVAC systems, and by the unlawful profits Carrier earned from the sales of these falsely advertised products.

117.    Had Cormier and the Massachusetts Sub-Class members known that Carrier's HVAC systems contained a chemical contaminant that cause TXV failures necessitating expensive repairs and, also, damage to the systems, Cormier and the Massachusetts Sub-Class members would not have purchased the systems, or would have paid significantly less for them.

118.    Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Cormier, and each of the other members of the Massachusetts Sub-Class, are entitled to recover statutory damages or actual damages, including recovery of double or treble the amount of their actual damages, plus reasonable attorneys' fees and the costs of the action.

119.    Cormier and the other members of the Massachusetts Sub-Class are also entitled to injunctive relief in the form of an order directing Carrier to cease its deceptive practices.

<u>COUNT V</u>
**Violations of the Michigan Consumer Protection Act ("MCPA")**
**MICH. COMP. LAWS §§ 445.901 – .922**
**(Shoner, Individually and on Behalf of the Michigan Sub-Class)**

120.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

121.     Shoner brings this claim on behalf of himself and the Michigan Sub-Class.

122.     Shoner, Michigan Sub-Class members, and Defendant fall within the definition of "person" under the MCPA. MICH. COMP. LAWS § 445.902(d).

123.     The MCPA is designed to provide a remedy for consumers who are injured by deceptive business practices. The MCPA expressly allows for class actions on behalf of consumers who have suffered a loss as a result of a violation of the act. MICH. COMP. LAWS § 445.911(3).

124.     Carrier's conduct alleged herein constitutes unfair, unlawful, unconscionable, and deceptive acts in violation of the MCPA, including, but not necessarily limited to, the following sections:

> (a)  Section 445.903(1)(c): Carrier represented that its HVAC systems have characteristics, uses, or benefits that they do not have;

> (b)  Section 445.903(1)(d): Carrier represented that its HVAC systems were new when they were deteriorated;

> (c)  Section 445.903(1)(e): Carrier represented that its HVAC systems were of a particular standard, quality, or grade, when they were of another.

> (d)  Section 445.903(1)(s): Carrier failed to reveal material facts, the omission of which tended to mislead or deceive the consumers, and which fact could not reasonably be known by the consumers;

(e) Section 445.903(1)(bb): Carrier made representations of fact material to the transaction such that consumers reasonably believed the represented state of affairs to be other than it actually was; and

(f) Section 445.903(1)(cc): Carrier failed to reveal facts that were material to the purchase of affected HVAC systems in light of the representations of fact made in a positive manner.

125.    Specifically, as alleged herein, Carrier knowingly or recklessly made misrepresentations about the quality, characteristics, performance, and reliability of its affected HVAC systems, which contained a chemical contaminant that caused clogged TXVs and, also, further harm to the systems.

126.    Carrier's unfair and deceptive scheme to mislead consumers was comprised of countless unfair and deceptive acts or practices, including, but not limited to, manufacture and sale of HVAC systems with a manufacturing defect and uniformly representing to Shoner and the Michigan Sub-Class, by means of its advertising and marketing, false information, and product packaging (including federally required EnergyGuide labels) regarding the efficiency, performance, reliability, and warranty terms of its HVAC systems. These unfair and deceptive acts and practices have a capacity, tendency, and/or likelihood to deceive or mislead reasonable consumers.

127.    Defendant concealed, omitted, and failed to disclose the truth about its affected HVAC systems in order to sell the remainder of its affected inventory and increase profits.

128.    Defendant had a duty to disclose the material defect because it had exclusive knowledge of the presence of Ryconox (i.e., a material defect) and such contamination was not reasonably accessible to Shoner and the Michigan Sub-Class.

129.    Had Shoner and the Michigan Sub-Class members known that Carrier's HVAC systems contained a chemical contaminant that cause TXV failures necessitating expensive repairs and, also, damage to the systems, Plaintiff and the Michigan Sub-Class members would not have purchased the systems, or would not have paid the premium price for Carrier's HVAC systems.

130.    As a direct and proximate result of Carrier's business practices, Shoner and proposed Michigan Sub-Class members suffered injury in fact and lost money or property because they purchased and paid for HVAC systems that they otherwise would not have purchased or would have paid significantly less for them.

131.    Shoner and proposed Michigan Sub-Class members are entitled to actual or statutory damages, attorneys' fees, an injunction, and other equitable relief, including restitutionary disgorgement of all profits accruing to Defendant because of its unfair and deceptive practices and such other orders as may be necessary to prevent the future use of these practices. MICH. COMP. LAWS § 445.911.

### COUNT VI
**Massachusetts U.C.C. Breach of Express Warranty**
**MASS. GEN. LAWS ch. 106, § 2-313**
**(Cormier, Individually and On Behalf of the Massachusetts Sub-Class)**

132.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

133.    Cormier brings this claim on behalf of himself and the Massachusetts Sub-Class.

134.    As an express warrantor and manufacturer and merchant, Carrier has certain obligations under MASS. GEN. LAWS ch. 106, § 2-313 to conform its HVAC systems to the express warranties.

135.    When Cormier and the members of the Massachusetts Sub-Class purchased their HVAC systems, Carrier expressly provided a warranty "against failure due to defect in materials

or workmanship." Carrier's warranty further provided that it "will provide a new or remanufactured part . . . to replace the failed defective part" with no exclusion for oil. Carrier breached its express warranty by promising and then failing to provide adequate parts to remedy the defect.

136.    The defect at issue in this litigation was present at the time the HVAC systems were sold to Cormier and the members of the Massachusetts Sub-Class.

137.    Carrier breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

138.    Although Carrier was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

139.    Carrier has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

140.    Cormier and the members of the Massachusetts Sub-Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Carrier or by operation of law in light of Carrier's conduct as described throughout this Complaint.

141.    Carrier received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Carrier has failed and refused to offer an effective remedy.

142.    As a manufacturer of consumer goods, Carrier's attempts to limit or modify the remedies for its breach of its express warranties are unenforceable. MASS. GEN. LAWS ch. 106, § 2-316A(3).

143.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Carrier to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Carrier's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects. Carrier possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale. Carrier concealed and did not disclose this defect, and did not remedy the defect prior to sale (or afterward). Any effort to otherwise limit liability for the defect is null and void.

144.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Carrier to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Carrier's express warranties to fail of their essential purpose, and are, therefore, void.

145.    Cormier and the members of the Massachusetts Sub-Class have suffered damages caused by Carrier's breach of its express warranties and are entitled to recover damages.

<u>**COUNT VII**</u>
**Massachusetts U.C.C. Breach of Implied Warranty**
**MASS. GEN. LAWS ch. 106, § 2-314**
**(Cormier, Individually and On Behalf of the Massachusetts Sub-Class)**

146.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

147.    Cormier brings this claim on behalf of himself and the Massachusetts Sub-Class.

148.    Carrier is and was at all relevant times a merchant with respect to the HVAC systems. Carrier directly sold and marketed its HVAC systems to Cormier and the Massachusetts

Sub-Class through its dealers for the intended purpose of installing those HVAC systems in homes for consumer use. Carrier knew that its HVAC systems would and did pass unchanged from itself to Cormier and the Massachusetts Sub-Class.

149.    A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to MASS. GEN. LAWS ch. 106, § 2-314.

150.    As a manufacturer of consumer goods, Carrier's attempts to exclude or limit the implied warranties are unenforceable. MASS. GEN. LAWS ch. 106, §  2-316A(2). Carrier's attempts to exclude or limit the implied warranties were otherwise ineffective or unconscionable.

151.    Carrier implicitly warranted that its HVAC systems were of good and merchantable condition and quality in that the systems: (1) pass without objection in the trade; (2) were fit and safe for their ordinary intended use, namely to provide heating and cooling in homes; (3) conform to the promises or affirmation of fact made on the container or label. *See* MASS. GEN. LAWS ch. 106, §  2-314(2).

152.    The HVAC systems were defective at the time they left the possession of Carrier, and the manufacturing process was defective as described herein. Carrier knew of this defect at the time these transactions occurred. Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition, did not pass without objection in the trade, were not fit for their intended purpose, and did not conform to the affirmation of facts made on the products' labels.

153.    By virtue of the conduct described herein and throughout this Complaint, Carrier breached the implied warranty of merchantability.

154.    Cormier and the members of the Massachusetts Sub-Class have performed each and every duty required of them under the terms of the warranties, except as may have been

excused or prevented by the conduct of Carrier or by operation of law in light of Carrier's unconscionable conduct.

155.    Carrier received timely notice regarding the problems at issue in this litigation through numerous complaints from consumers, presentations of Plaintiffs' HVAC systems to Carrier for warranty repair work, and through legal proceedings against Carrier. Notwithstanding such notice, Carrier has failed and refused to offer an effective remedy.

156.    Cormier and the Massachusetts Sub-Class have had sufficient dealings with Carrier or its agents to establish privity of contract. Notwithstanding this, privity is not required in this case because Cormier and the members of the Massachusetts Sub-Class are: (1) purchasers of consumer goods, and (2) intended third-party beneficiaries of contracts between Carrier and its dealers; specifically, they are intended beneficiaries of Carrier's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

157.    As a direct and proximate result of Carrier's breach of the implied warranty of merchantability, Cormier and the Massachusetts Sub-Class members were caused to suffer economic damage.

**<u>COUNT VIII</u>**
**Michigan U.C.C. Breach of Express Warranty**
**MICH. COMP. LAWS § 440.2313**
**(Shoner, Individually and on Behalf of the Michigan Sub-Class)**

158.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

159.     Shoner brings this claim on behalf of himself and the Michigan Sub-Class.

160.     As an express warrantor and manufacturer and merchant, Carrier has certain obligations under MICH. COMP. LAWS § 440.2313 to conform its HVAC systems to the express warranties.

161.     When Shoner and the members of the Michigan Sub-Class purchased their HVAC systems, Carrier expressly provided a warranty "against failure due to defect in materials or workmanship." Carrier's warranty further provided that it "will provide a new or remanufactured part . . . to replace the failed defective part" with no exclusion for oil. Carrier breached its express warranty by promising and then failing to provide adequate parts to remedy the defect.

162.     The defect at issue in this litigation was present at the time the HVAC systems were sold to Shoner and the members of the Michigan Sub-Class.

163.     Carrier breached its express warranties (and continues to breach these express warranties) because it did not (and has not) corrected the defect with its HVAC systems.

164.     Although Carrier was obligated to correct the defect with its HVAC systems, none of the purported, attempted fixes are adequate under the express warranty, as they did not cure the defect.

165.     Carrier has failed to conform its HVAC systems to the express warranties, and, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

166.     Shoner and the members of the Michigan Sub-Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Carrier or by operation of law in light of Carrier's conduct as described throughout this Complaint.

167.    Carrier received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, Carrier has failed and refused to offer an effective remedy.

168.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Carrier to limit its express warranties in a manner that would exclude or limit coverage for the manufacturing defect in its HVAC systems would be unconscionable. Carrier's warranties were adhesive, and did not permit negotiation, or the inclusion of manufacturing defects. Carrier possessed superior knowledge of the defective manufacturing prior to offering the HVAC systems for sale. Carrier concealed and did not disclose this defect, and Carrier did not remedy the defect prior to sale (or afterward). Any effort to otherwise limit liability for the defect is null and void.

169.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Carrier to limit its express warranties in a manner that would result in limiting remedies to the exclusion of labor and other expenses incurred in repairing or replacing the defective products are unconscionable, fail to conform to the requirements for limiting remedies under applicable law, and cause Carrier's express warranties to fail of their essential purpose, and are, therefore, void.

170.    Shoner and the members of the Michigan Sub-Class have suffered damages caused by Carrier's breach of its express warranties and are entitled to recover damages.

**COUNT IX**
**Michigan U.C.C. Breach of Implied Warranty**
**MICH. COMP. LAWS § 440.2314**
**(Shoner, Individually and on Behalf of the Michigan Sub-Class)**

171.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

172.    Shoner brings this claim on behalf of himself and the Michigan Sub-Class.

173. Carrier is and was at all relevant times a merchant with respect to the HVAC Systems. Carrier directly sold and marketed its HVAC Systems to Shoner and the Michigan Sub-Class through Carrier's dealers for the intended purpose of installing those HVAC systems in homes for consumer use. Carrier knew that its HVAC systems would and did pass unchanged from itself to Shoner and the Michigan Sub-Class.

174. A warranty that the HVAC systems were in merchantable quality and condition is implied by law pursuant to MICH. COMP. LAWS § 440.2314.

175. Carrier's attempts to exclude or limit the implied warranties were ineffective or unconscionable.

176. Carrier implicitly warranted that its HVAC systems were of good and merchantable condition and quality in that the systems: (1) pass without objection in the trade; (2) were fit and safe for their ordinary intended use, namely to provide heating and cooling in homes; (3) conform to the promises or affirmation of fact made on the container or label. *See* MICH. COMP. LAWS § 440.2314(2).

177. The HVAC systems were defective at the time they left the possession of Carrier, and the manufacturing process was defective as described herein. Carrier knew of this defect at the time these transactions occurred. Thus, the HVAC systems, when sold and at all times thereafter, were not in merchantable condition, did not pass without objection in the trade, were not fit for their intended purpose, and did not conform to the affirmation of facts made on the products' labels.

178. By virtue of the conduct described herein and throughout this Complaint, Carrier breached the implied warranty of merchantability.

179.    Shoner and the members of the Michigan Sub-Class have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Carrier or by operation of law in light of Carrier's unconscionable conduct.

180.    Carrier received timely notice regarding the problems at issue in this litigation both through presentations of Plaintiffs' HVAC systems to Carrier for warranty repair work and through legal proceedings against Carrier. Notwithstanding such notice, Carrier has failed and refused to offer an effective remedy.

181.    Shoner and the Michigan Sub-Class have had sufficient dealings with Carrier or its agents to establish privity of contract. Notwithstanding this, privity is not required under Michigan law. Additionally, privity is not required in this case because Shoner and the members of the Michigan Sub-Class are: (1) purchasers of consumer goods, and (2) intended third-party beneficiaries of contracts between Carrier and its dealers; specifically, they are intended beneficiaries of Carrier's implied warranties. The dealers were not intended to be the ultimate consumers of the HVAC systems and have no rights under the warranty agreements provided with the HVAC systems. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

182.    As a direct and proximate result of Carrier's breach of the implied warranty of merchantability, Shoner and the Michigan Sub-Class members were caused to suffer economic damage, including loss attributable to the diminished value of their homes and HVAC systems, as well as the monies spent and to be spent to repair and/or replace their HVAC systems.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

(b)    Ordering injunctive relief;

(c)    Awarding of all actual, general, special, incidental, statutory, treble or multiple, punitive and consequential damages to which Plaintiffs and Class members are entitled;

(d)    Awarding of pre-judgment and post-judgment interest on such monetary relief;

(e)    Awarding of restitution in an amount according to proof;

(f)    Awarding Plaintiffs and Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and costs; and

(g)    Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.


Dated: June 8, 2018                                  Respectfully submitted,


By:  */s/ Laurie Rubinow*
     James E. Miller
     Laurie Rubinow
     **SHEPHERD, FINKELMAN, MILLER
     & SHAH, LLP**
     65 Main Street
     Chester, CT 06412
     Telephone: (860) 526-1100
     Facsimile: (866) 300-7367
     jmiller@sfmslaw.com
     lrubinow@sfmslawcom

James C. Shah
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
jshah@sfmslaw.com

Timothy N. Mathews
Zachary P. Beatty
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone (610) 642-8500
FAX (610) 649-3633
tnm@chimicles.com
zpb@chimicles.com

*Attorneys for Plaintiffs*